IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



**FILED**

MAY 1 2 2014

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| LORA PLASKON and BRIAN J. PLASKON, | CV 12-72-BLG-SPW |
| Plaintiffs, | |
| vs. | ORDER |
| CHICO HOT SPRINGS, INC. d/b/a CHICO HOT SPRINGS RESORT AND DAY SPA; CHICO HOT SPRINGS RANCH, INC.; and CHUCK KENDALL d/b/a DIAMOND K OUTFITTERS, | |
| Defendants. | |

Before the Court are two summary judgment motions. Plaintiffs Lora and

Brian Plaskon ("Plaskons") brought this action after Lora sustained injuries falling

off a horse on a trail ride. Defendant Chuck Kendall ("Diamond K") moves for

partial summary judgment as to the Plaskons' request for punitive damages.

Defendants Chico Hot Springs, Inc. and Chico Hot Springs Ranch, Inc. ("Chico")

move for summary judgment as to both liability and the Plaskons' request for

punitive damages. With respect to liability, Chico argues that because Diamond K

was an independent contractor, Chico cannot be held vicariously liable for

Diamond K's negligence and that there is insufficient evidence to find Chico

1

independently negligent. In the event this Court rejects its liability argument, Chico argues summary judgment is appropriate on the Plaskons' punitive damages claim.

For the reasons discussed below, the Court denies Chico's Motion for Summary Judgment as to the vicarious liability issue, but grants the motion as to Chico's independent liability. The Court grants both Chico's and Diamond K's motions relating to the Plaskons' claim for punitive damages.

## BACKGROUND

### I.     Chico's Relationship with Diamond K

At the relevant time, Chuck Kendall ("Chuck") operated Diamond K. (Depo. Chuck Kendall, Doc. 34-2 at 10-11). Diamond K began operating at Chico in the early 2000s. (Depo. Davis, Doc. 34-1 at 21). In 2005, Chico and Diamond K signed an agreement that outlined the scope of Diamond K's operations. (Doc. 34-3). The agreement identified Diamond K "as an independent contractor and not as an agent." (*Id.* at 1). Chuck understood this to mean that he "wasn't working as an employee of Chico Hot Springs…[he] was contracting services." (Depo. Chuck, Doc. 34-2 at 13).

Diamond K paid Chico $15,000 a year to lease the barn. (Doc. 34-3 at 2; Depo. Davis, Doc. 34-1 at 4). Although not stated in the written contract, Chico's general manager testified that the lease included Diamond K's use of Chico's

2

permit that allowed horseback rides onto neighboring National Forest land. (Depo. Davis, Doc. 34-1 at 4). The agreement was for a term of one year, but renewed annually by verbal agreement until a new contract was drafted in 2010. (Depo. Chuck, Doc. 34-2 at 12).

Diamond K scheduled the rides. (Depo. Davis, Doc. 34-1 at 12). If a customer called Chico's front desk asking about horseback riding, the customer would be transferred to the barn. (*Id.* at 11-12). Diamond K provided all of the horses, tack, and wranglers. (Doc. 34-3 at 1). If the customer paid in cash or check for the ride, the payment would be made directly to Diamond K at the barn. (Depo. Davis, Doc. 34-1 at 23). If the customer wanted to bill their room or pay with a credit card, Chico would process the payment, because Diamond K did not have the electronic technology necessary to process credit card payments. (*Id.*). Chico would periodically write Diamond K checks for the credit card amounts collected electronically. (*Id.* at 25).

Diamond K had its own tax identification number, operated its own payroll, and carried its own insurance. (*Id.* at 11). Diamond K also hired its own employees. (*See* Depo. Amanda, Doc. 34-4 at 33-35). Once hired, however, Chico required all Diamond K employees to read the Chico Employee Guidelines ("Guidelines"), sign the Guidelines and return them to Amanda. (*Id.* at 35). The Guidelines established standards and procedures applicable to Chico's employees.

3

(*See generally* Doc. 40-3). The Guidelines also applied to Diamond K employees by specifically defining "contract employees" as those working for the horse operation. (*Id.* at 15).

With a few specific exceptions, the Guidelines imposed the same requirements on "contract employees" that Chico expected of its own employees. After the definition of "contract employee," the Guidelines provided that:

> [w]ith the exception of the information contained in the Employee Guidelines Sections 4. A-F, 5. A-F, and 6. A-B, the same rules, regulations, directions and expectations for regular employees also pertain to contract employees. Non-compliance or violation may subject the contract employee to the loss of his or her position. This includes swim privileges which are detailed in Section 6. C.

(*Id.*). Section 4. A-F described new employee orientation, the probation period, and time clock procedures. (*Id.* at 12-15). Section 5. A-F described pay periods and procedures, (*Id.* at 16-17), and Section 6. A-B described their retirement plan and insurance options, (*Id.* at 18-20).

Absent the above exceptions, Diamond K employees were subject to all the provisions of the Guidelines. (*Id.* at 21-22). Diamond K employees were subject to Chico's dress code and personal appearance policy, including limitations on jewelry, piercings, and tattoos. (*Id.* at 23-24). Section 7. E listed numerous actions that were prohibited and would "result in disciplinary action up to and including termination," including driving faster than 5 m.p.h. on Chico premises or missing two scheduled shifts. (*Id.* at 25-26). Section 8 also described several Chico

4

policies, the violation of which could result in termination. (*Id.* at 27-30). Finally, the Guidelines provided that Diamond K employees were subject to Chico's leave and vacation policies described in Section 6. E-F.

## II.    The Accident

Chico is a resort in Park County, MT, that offers overnight accommodations, a restaurant, and swimming in its hot springs pools. (Doc. 1, ¶ 2). Chico also offers, through "four different subcontractors," horseback riding, dog sledding, rafting, and a day spa. (Depo. Colin Davis, Doc. 34-1 at 3-4). At the relevant time, "subcontractor" Diamond K offered horseback riding and trail rides, which were based out of a barn leased from Chico. (*Id.* at 4).

On June 22, 2009, after staying overnight at Chico, Lora, her two children, and her father signed up for a trail ride through Diamond K. (Doc. 1, ¶¶ 10-11). Amanda Kendall ("Amanda") was the wrangler in charge of the trail ride that day. (*Id.* at ¶ 15; Depo. Amanda Kendall, Doc. 34-4 at 52). Amanda put Lora on a horse named Rueben and placed Lora's daughter on a horse named Romeo. (Depo. Amanda, Doc. 34-4 at 49). According to Lora, Amanda put Lora in the back of the line, immediately behind her daughter without presenting Lora with a choice as to her placement. (Depo. Lora Plaskon, Doc. 40-2 at 33). In contrast, Amanda testified that while Romeo was usually placed at the end of the line because he was the slowest horse, she deferred to Lora's request that Lora be

5

placed behind her daughter because Lora was an experienced rider. (Depo. Amanda, Doc. 34-4 at 52).

After Amanda gave the riders a verbal lesson in horseback riding, the group set off on their trail ride. (*Id.* at 53). Again, Amanda's and Lora's recollections diverge. Lora testified she had difficulty with Rueben from the start. (Depo. Lora, Doc. 40-2 at 33-34). She noticed that once they left the corrals, Rueben was more "energetic" than Romeo and began pressing up very close behind Romeo. (*Id.* at 34). Lora yelled at Amanda that she was having difficulty controlling Rueben, but according to Lora, all Amanda told Lora was to pull back on the reins. (*Id.*).

Despite Lora's compliance with Amanda's instruction, Rueben kept bumping into Romeo. (*Id.*). Lora testified that Rueben "would nudge [Romeo] with his head, and as if to push him to say, move on, he was kind of lunging with his head." (*Id.*). Romeo apparently did not appreciate the attention, as he would "whinny" and turn and snort at Rueben. (*Id.*). Lora again yelled at Amanda about her difficulties, and Amanda instructed Lora to pull up on the reins. (*Id.*).

When the group reached a scenic vantage point, they stopped for a picture. (*Id.*). While stopped, Lora testified that she again expressed to Amanda her inability to control Rueben. (*Id.* at 35). Amanda repeated her instruction to pull back on the reins. (*Id.*). Lora testified that Rueben continued to ignore her attempts to slow him down and he kept on lunging at Romeo's rear. (*Id.*).

6

Eventually, Romeo kicked at Rueben, causing Rueben to rear back and throw Lora off the saddle. (Depo. Amanda, Doc. 34-4 at 58). Lora landed on her back and appeared to be seriously injured. (*Id.* at 63). Amanda radioed Chico for help and called 911. (*Id.* at 58). Chico's general manager drove to the accident scene and arrived within five minutes. (Depo. Davis, Doc. 34-1 at 16). An ambulance arrived at the scene and took Lora to a hospital. (*Id.* at 17). According to the Complaint, Lora suffered permanent injuries as a result of the fall and is still unable to completely resume her career as a surgeon. (Doc. 1 at ¶¶ 41-47).

In contrast to Lora's testimony, Amanda testified she does not remember hearing Lora ever yell or ask for assistance prior to the fall. (Depo. Amanda, Doc. 34-4 at 56-57). Amanda stated that she would have instructed Lora to pull up on the reins if Rueben tried to stop and eat, but she does not recall if she ever did so. (*Id.*).

The Plaskons filed this instant action against Chico and Diamond K on June 19, 2012 seeking damages resulting from the fall, including punitive damages from both Chico and Diamond K. (Doc. 1).

## LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the

initial burden of showing an absence of material fact. *F.T.C. v. Stefanchik,* 559 F.3d 924, 927 (9th Cir. 2009). If the initial burden is met, the nonmoving party must then show, by specific citations to the record, "at least some significant probative evidence tending to support the complaint." *T.W. Elec. Serv., Inc. v. P. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987) (internal quotation omitted). In reviewing a summary judgment motion, the Court cannot judge the credibility of the witnesses. *See U.S. v. Two Tracts of Land in Cascade County, Mont.,* 5 F.3d 1360, 1362 (9th Cir. 1993). Rather, all reasonable inferences must be drawn in favor of the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 631.

This Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332. (Doc. 1 at 1-3). Accordingly, this Court will apply Montana's substantive law. *Med. Laboratory Mgt. Consultants v. Am. Broad. Companies, Inc.,* 306 F.3d 806, 812 (9th Cir. 2002).

## DISCUSSION

Chico moves for summary judgment on the grounds that it was not negligent in causing the Plaskons' injuries as a matter of law. First, Chico argues that Diamond K was an independent contractor, and therefore Chico is not vicariously liable for any negligence attributable to Diamond K. Second, Chico contends that the Plaskons have failed to produce any

evidence of Chico's direct negligence. Both Diamond K and Chico contend that they should be awarded summary judgment as to the Plaskons' claim for punitive damages. The Court will address Chico's liability argument before turning to the issue of punitive damages.

## I. Chico's liability

As mentioned above, Chico argues that (1) it cannot be found vicariously liable for Diamond K's negligence, and (2) there is no evidence of direct negligence by Chico.

### A. Questions of material fact about whether Diamond K was an independent contractor preclude summary judgement on Chico's vicarious liability.

The Court disagrees with Chico's assertion that the undisputed material facts show that Diamond K was an independent contractor and finds that a dispute of material fact precludes the entry of summary judgment.

A principal is responsible for the negligence of its agents. Mont. Code Ann. § 28-10-602(1). An agency occurs when the agent is "really employed by the principal." § 28-10-103(1). In contrast, an employer is generally not vicariously liable for the torts of their independent contractors. *Beckman v. Butte-Silver Bow County*, 1 P.3d 348, 350 (Mont. 2000).

"The right to control constitutes the most crucial factor in distinguishing between employees and independent contractors." *Eldredge*

*v. Asarco Inc.*, 252 P.3d 182, 191 (Mont. 2011).    The right of control involves the employer's "right to control the details, methods, or means of accomplishing the individual's work." *Butler v. Domin*, 15 P.3d 1189, 1194 (Mont. 2000).  To determine whether an employer retains the right of control, courts consider the following four factors: (1) direct evidence of right or exercise of control; (2) method of payment; (3) furnishing of equipment; and (4) right to fire. *Id.* at 1194-95.  To date, the Montana Supreme Court is unclear whether this is a factors test and the four parts are to be balanced against each other, *see Eldredge*, 252 P.3d at 191; *Butler*, 15 P.3d at 1194-95; *Brookins v. Mote*, 292 P.3d 347, 355 (Mont. 2012),  or whether this is a conjunctive test and "independent contractor status must be established by a convincing accumulation of evidence under the factors," *Am. Agrijusters Co. v. Montana Dept. of Lab. and Indus.*, 988 P.2d 782, 787 (Mont. 1999); *see also Spain v. Montana Dept. of Revenue*, 49 P.3d 615, 619 (Mont. 2002); *Walling v. Hardy Const.*, 807 P.2d 1335, 1338 (Mont. 1991).

This Court need not guess at the Montana Supreme Court's intent here, however, because, whether the test is conjunctive or a balancing test, disputed material facts regarding the first and fourth factors preclude summary judgment.  Because these two factors preclude summary judgment, this Court need not discuss the second and third factors.

## *(i) Direct Evidence of Right or Exercise of Control*

Under the first factor this Court must determine whether Chico had the right of control over Diamond K's operations. This is the "most crucial factor in distinguishing between employees and independent contractor." *Am. Agrijusters*, 988 P.2d at 787. The focus is not whether Chico controlled the end result, but rather whether Chico controlled the methods in which the result was achieved. *Johnson v. Montana Dept. of Lab. & Indus.*, 783 P.2d 1355, 1358 (Mont. 1989). The test is not whether the employer exercised control, but whether the employer had the right of control. *Sharp v. Hoerner Waldorf Corp.*, 584 P.2d 1298, 1301 (Mont. 1978).

In attempting to establish that Diamond K was an independent contractor, Chico points out that it was minimally involved in Diamond K's day-to-day operations. At most, Chico's general manager would walk past the barn every day. (Depo. Davis, Doc. 34-1 at 8). Chico would try its best not to "micromanage" Diamond K's operations. (*Id.* at 4). Chico further contends that there is no evidence to show that Chico ever tried to dictate exactly how Diamond K would operate the trail rides, such as determining which customer would ride a specific horse, selecting the order of the horses, or determining the speed of the horses. (Doc. 44 at 3-4).

In contrast, the Plaskons point to two pieces of evidence in support of their assertion that Chico exercised control over Diamond K's operations. First, the Plaskons cite to the National Forest permit held by Chico. (*See* Doc. 40-1 at 1, defining Chico as "the holder"). The Plaskons point out that pursuant to the terms of the permit, Chico could not "assign all or part of the authorized use to others." (*Id.* at 2). Additionally, the permit requires the holder to obtain insurance and name the United States as an additional insured. (*Id.* at 3). Finally, appended to the permit was an "Annual Operation Management Plan" that was authored by Chico. (*Id.* at 8-9). The Plaskons argue that since the permit was non-transferrable, Diamond K would have had to be an agent or employee to use the permit. Further, the Plaskons argue that Chico's development of the "Annual Operation Management Plan" evidences its control over Diamond K's operations.

Second, the Plaskons identify the Guidelines as evidence of control. The Plaskons point out that a plain reading of the Guidelines requires Diamond K's employees to adhere to Chico's policies regarding appearance, behavior, and attendance. According the Guidelines, these are not mere suggestions; the Guidelines specifically state that Chico retains the right to fire any "contract employee" who violates these policies.

Taken cumulatively, the above evidence could lead a trier of fact to conclude that Chico controlled the "details, methods, or means of accomplishing" Diamond K's work. *Butler*, 15 P.3d at 1194. The permit raises questions about who was responsible for obtaining insurance. While its contributions appear minimal, Chico drafted an Annual Operations Management Plan that described the safety steps it would take and the number of days Chico would operate under the permits. Although it could not "assign all or part of the authorized use to others," Chico allowed Diamond K to operate under the permit. (Doc. 40-1 at 2). This authorization to use the permit seems to indicate a right of control, as Chico was prohibited from allowing Diamond K unfettered use of the permit. The Court agrees with the Plaskons and concludes that there is a dispute of material fact as to whether Chico had a right to control Diamond K.

Further, the Guidelines explicitly controlled and mandated Diamond K's employees' conduct. The Guidelines required Diamond K's employees to adhere to Chico's policies regarding appearance, behavior, and attendance. Chico contends that this was not the actual case, as one time Diamond K ignored Chico's suggestion that all the wranglers wear matching hats and scarves. (Depo. Davis 29:4-12). However, the focus is on the employer's "right, not just the exercise, of control." *Am. Agrijusters*, 988

13

P.2d at 787 (internal citation omitted). The Guidelines seemingly gave Chico the right of control over how Diamond K managed their operations and how the employees conducted themselves.

### (ii) The Right to Fire

The fourth factor is whether Chico had a right to fire any Diamond K employees. *Butler*, 15 P.3d at 1195. The inquiry is whether the employer had the right to terminate the employee without incurring contractual liability. *Eldredge*, 252 P.3d at 191-92. This factor is similar to the first factor, as "[t]he power to fire…is the power to control." *Am. Agrijusters*, 988 P.2d at 790 (internal citation omitted).

Chico contends that the Guidelines did not create such a right. It argues that "[n]othing in the [Guidelines] or in the evidence supports a different conclusion. There is simply no evidence in the record that Chico ever believed that it could fire a Diamond K employee or that it ever even tried." (Doc. 44 at 10). This Court disagrees.

In the Guidelines, Chico specifically reserved the right fire any contract employee that violated portions of the handbook. (Doc. 40-3 at 15). Additionally, immediately after the definition of "contract worker," the Guidelines provided that a violation of certain policies "may subject the contract employee to the loss of his or her position." (Doc. 40-3 at 15). The

14

Guidelines are clear that a worker at Diamond K was considered a "contract employee" and only exempt from Sections 4. A-F, 5. A-F, and 6. A-B. (*Id.*). According to a plain reading of the Guidelines, a Diamond K employee was subject to the termination provisions in the Guidelines. For example, if a Diamond K employee was not punctual in showing up to work, Chico reserved the right to fire him. (*Id.* at 25). Chico could also terminate any Diamond K employee who used abusive language towards anyone on Chico property or drove over 5 m.p.h. on the premises. (*Id.* at 25-26). Chico could also terminate any Diamond K employee who violated any policy listed in Section 8. (*Id.* at 27). Chico's requirement that Diamond K employees sign the Guidelines, which specifically reserved Chico's right to terminate Diamond K employees under various circumstances, at the very least raises an issue of material fact on this factor.

The plain language of the Guidelines gives Chico the power to fire any contract employee. Chico defined "contract employee" and could have exempted any contract employee from the chance of termination. However, Chico opted to include the language that subjects contract employees to possible termination by Chico.

### (iii) Conclusion

Based on the disputed material facts that exist with respect to factors one and four, Chico has failed to establish that Diamond K was an independent contractor. Accordingly, Chico's Motion for Summary Judgment as it relates to vicarious liability for any of Diamond K's negligence is DENIED.

**B. Absent any vicarious liability, Chico cannot be found directly liable.**

In addition to alleging that Chico is vicariously liable for Diamond K's negligence, the Plaskons have alleged that Chico is directly liable for failing to provide an adequate number of horses. The Plaskons devote two sentences to this theory in their brief. (Doc. 41 at 17-18). This Court rejects the Plaskons' claim of direct liability.

To maintain their direct negligence claim against Chico, the Plaskons must show that Chico owed them a duty to supply an adequate number of horses for Diamond K's use. *Jacobs v. Laurel Vol. Fire Dept.*, 26 P.3d 730, 732 (Mont. 2001). The Plaskons rely on Chico's contract with Diamond K to establish Chico's duty to provide an adequate number of horses.

According to the agreement between Chico and Diamond K, Diamond K was responsible for providing up to 24 guest horses. (Doc. 34-3 at 1). The agreement imposed no duty on Chico to provide any number of horses.

(*Id.*) On the day of the accident, Diamond K only had six horses available for guests to ride. (Depo. Amanda, Doc. 34-4 at 52). While other horses remained in the corral, they were either hurt or horses for the wranglers. (*Id.* at 54).

Chico had no duty to supply any horses. The agreement stated that "Diamond K...will provide *up to a maximum* of...24 head of guest horses." (Doc. 34-3 at 1 (emphasis added)). Chico did not dictate the minimum number of horses that Diamond K needed to have available. Rather, the number of horses available was determined solely by Diamond K.

Chico was not contractually bound to provide horses to Diamond K. Nor did Chico impose on Diamond K a minimum number of horses to be made available. No contract or agreement created a duty on Chico to make horses available to ride. It was Diamond K's duty to supply the horses, not Chico's. Accordingly, Chico's Motion for Summary Judgment as to any direct negligence is GRANTED.

## II. The Plaskons claim for punitive damages fails due to a lack of actual malice.

Both Diamond K and Chico move for summary judgment as to the Plaskson's claim for punitive damages. The Plaskons contend that a reasonable jury could find that Diamond K acted with actual malice.

## A. Diamond K did not act with actual malice.

Punitive damages may be awarded upon a finding of actual malice or actual fraud. § 27-1-221(1). The Plaskons argue an actual malice theory. "Actual malice" is defined as follows:

> A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
>
>> (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
>>
>> (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

§ 27-1-221(2). The Plaskons need to show that (1) Diamond K knew of facts or intentionally disregarded facts (2) that created a high probatility of injury to Lora and (3) deliberately acted in conscious or intentional disregard of, or with indifference to, the high probability of injury to Lora. *Dunn v. Ancra Intern. LLC*, CV 10-58-M-DWM, 2011 WL 4478478 at *6 (D. Mont. 2011). Actual malice must be proven by clear and convincing evidence. § 27-1-221(5).

"Punitive damages are an extraordinary remedy, outside of the field of usual redressful remedies, and should be applied with caution." *Safeco Ins. Co. v. Ellinghouse*, 725 P.2d 217, 226-27 (Mont. 1986). Punitive damages are not designed to recompense the plaintiff; they are designed to punish or

modify the defendant's behavior. *Czajkowski v. Meyers*, 172 P.3d 94, 103 (Mont. 2007). To prevail on a claim for punitive damages, the "plaintiff must allege and prove something more than mere negligence." *Barnes By and Through Barnes v. United Indus., Inc.*, 909 P.2d 700, 704 (Mont. 1996), *overruled on other grounds by Giambra v. Kelsey*, 162 P.3d 134 (Mont. 2007).

Even viewing the facts most favorably to the Plaskons, they cannot prove by clear and convincing evidence that Diamond K acted with actual malice towards Lora. Assuming that Amanda heard Lora's pleas for help and provided inadequate advice, she did not know or intentionally disregard facts that created a high probability of injury to Lora. The Plaskons have not brought forth sufficient evidence to show that Amanda knew that this situation created a significantly higher probability of injury to Lora than any other rider faced.

From 2002-2012, Diamond K has had only three claims brought against it for an injury sustained while horseback riding, including the present case. (Depo. Amanda, Doc. 34-4 at 39). Neither of the other two claims involved serious injuries, and only one resulted litigation. (*Id.*). Diamond K had no reason to believe that its method of conducting trail rides led to a high probability of injury.

In addition, there is no clear and convincing evidence that Amanda disregarded a high probability of injury to Lora by placing Lora on Rueben. Rueben was typically used as a horse for children. (*Id.* at 50). Aside from the instant case, Rueben had never been involved in an incident causing injury. (*Id.*). While Romeo was slower than Rueben, the Court does not find that Amanda disregarded a high probability of injury by placing Rueben behind a Romeo.

The Plaskons also point to Amanda bringing her dog on the trail ride. However, even the Plaskons' expert concedes that the dog did not cause the accident. (Doc. 40-5 at 4).

Finally, the Plaskons cite to their expert's report that Diamond K breached its standard of care in failing to adequately provide safety instruction. (Doc. 40-5 at 6). This evidence supports the Plaskons' negligence theory. The Plaskons' expert never opines that Diamond K's conduct was sufficiently egregious to support a claim for punitive damages.

In short, the Plaskons cannot show that Amanda was aware of a high probability of injury to Lora. While Amanda certainly knew that riding horses created a possibility of injury, the evidence does not support the contention that Amanda knew of facts that created a *high* probability of injury. "[M]ere knowledge of a potential danger is not enough." *Dunn* at

14. A reasonable trier of fact could not find by clear and convincing evidence that Diamond K acted with actual malice when Lora was injured. Diamond K's Motion for Partial Summary Judgment is GRANTED.

### B. The claim for punitive damages against Chico also fails.

As discussed above, Chico can only be found liable under the Plaskons' vicarious liability theory. Since Diamond K did not act with actual malice, Chico cannot be vicariously liable for punitive damages. Further, the Plaskons cannot assert an independent cause of action for punitive damages against Chico. *Peterson v. Eichhorn*, 189 P.3d 615, 624 (Mont. 2008). Chico's motion for summary judgment as to the Plaskons' punitive damages claim is GRANTED.

### CONCLUSION

For the reasons stated above, IT IS ORDERED:

1. Chico's Motion for Summary Judgment (Doc. 32) is GRANTED IN PART and DENIED IN PART. Chico's motion is denied as to the Plaskons' claim of vicarious liability. Chico's motion is granted as to the Plaskons' claim of direct liability. Chico's motion is also granted as to the Plaskons' punitive damages claim.

2. Diamond K's Motion for Partial Summary Judgment (Doc. 29) is GRANTED.

DATED this 12th day of May, 2014.

SUSAN P. WATTERS
United States District Judge